665 A.2d 836

**COMMONWEALTH of Pennsylvania**

v.

**Alice ARNOLD, Appellant.**

Superior Court of Pennsylvania.

Submitted June 19, 1995.

Filed Oct. 3, 1995.

Catherine M. Baggiano, Philadelphia, for appellant.

Vernette Dow, Assistant City Solicitor, Philadelphia, for Commonwealth, appellee.

Before TAMILIA, POPOVICH and BROSKY, JJ.

TAMILIA, Judge.

Alice Marsha Arnold appeals from the January 13, 1994 Order granting the petition of the Department of Human Services (DHS) for the involuntary termination of parental rights to appellant's son, Michael. The facts of this case as set forth in detail by DHS and adopted by the trial court are as follows.

On July 22, 1981, appellant, finding herself homeless, unemployed and lacking the financial resources to provide for Michael, signed a voluntary placement agreement with DHS. On that date, Michael was placed in a DHS foster home. On April 28, 1983, appellant went to DHS and requested that her other son, Dorian, be placed in a foster home because she did not have permanent housing. Appellant also said that she needed an extension to remain in the Salvation Army shelter because she had no family members with whom she could stay. DHS contacted the Salvation Army and obtained an extension for appellant and Dorian to continue residing in the shelter. At that time, appellant was also referred to PEC, a program to address her housing needs. On May 6, 1983, appellant again became homeless and was again referred to PEC by DHS. Appellant then began to reside with her maternal grandmother. Appellant once again found herself homeless and, on May 19, 1983, signed a voluntary placement agreement for Dorian. Dorian thereafter was placed in Michael's foster home. Subsequently, appellant attended a Family Service Plan (FSP) meeting with DHS and assured DHS employees that she would continue to look for housing and visit her children. The stated goal of the Plan, to which appellant agreed, was reunification of the family. On December 2, 1983, appellant informed DHS that she preferred to live without her

children rather than living in public housing. She also stated that she did not want her maternal grandparents considered as an alternative to foster care placement. Thereafter, appellant remained unemployed and lived at a train station, although DHS provided her with information concerning housing and job training. On February 17, 1984, appellant failed to confirm a scheduled visit with her sons. Despite DHS requests that she resume a regular visitation scheduled with her children, appellant again failed, on April 13, 1984, to confirm a scheduled visit with her sons. Between January, 1985, and January, 1986, appellant visited her children only three times. On August 18, 1986, Dorian began living with his father in New Jersey and appellant refused to allow Michael to visit Dorian unless she could supervise the visits. No visits were made. In November, 1986, appellant lost contact with DHS and on December 10, 1986, DHS concluded that adoption would best serve Michael's interests. Resurfacing on February 18, 1987, appellant contacted DHS and objected to the adoption, although she scheduled no visitation with Michael. On August 27, 1987, a DHS employee informed appellant, who was still unemployed, that she was entitled to an attorney to represent her concerning the adoption of Michael. DHS was unable to contact Michael's father. Between January and June, 1988, appellant did not visit Michael. On September 13, 1988, Michael informed DHS that he was unsure of whether he wanted to be adopted. Between January and June of 1989, appellant contacted Michael only twice by telephone. Between July and December of 1989, appellant appeared at the offices of DHS once, but refused to wait until a DHS social worker was available. Appellant next visited Michael on January 17, 1991. On April 8, 1992, Michael told DHS that he wished to be adopted. Thereafter, appellant missed an FSP meeting concerning the adoption of Michael. She also failed to appear at scheduled court hearings on May 26 or July 6, 1992. Again DHS was unable to locate Michael's father. Appellant has been unemployed since at least 1988 and homeless for the great majority of Michael's life.

On January 13, 1994, a trial was held on DHS's petition to terminate appellant's parental rights. The court heard testimony from a social worker and supervisor at DHS and a supervisor from the Child Advocate Unit to the effect that appellant, who lived "a nomadic or homeless existence," had repeatedly failed, despite the efforts of DHS and the Child Advocate Unit, to plan for Michael's future or obtain suitable housing in the 13 years since Michael had been placed with DHS. Appellant testified that she did not want her parental rights to be terminated, although she admitted that she had done nothing for the child financially and had let others care for his needs for more than a decade. After recognizing the "sensitive nature of terminating the parental rights of the mother," the trial court held as follows:

> This mother may love her son, but she has done nothing to prevent termination of her parental rights. No obstacles were put in the way to prevent her from maintaining a place of importance in the child's life. All of DHS's efforts to help her were futile. She didn't want their help. As a result, mother failed to provide support, emotionally, physically or financially to this child. No bond has been developed between [this] mother and her son.

> . . . . .

> After finding clear and convincing evidence to terminate the parental rights of the mother, this court concludes that the needs and welfare of this child will be best served by remaining with his foster parent who can provide the child with what he desires, that is, to be adopted and live permanently in a stable, safe, caring environment.

(Slip Op., Kozay, J., 2/15/95, p. 4.) Appellant now presents this appeal from the termination of her parental rights.

Appellant first claims that the Order of the trial court was improper because she has not "evidenced a continued and irremediable parental incapacity such as would justify a decree of involuntary termination of parental rights." (Appellant's brief at 6.) Appellant also claims the Order was not supported by clear and convincing evidence.

 When reviewing a decision whether to involuntary terminate parental rights, our inquiry is limited to whether the decision of the court below was supported by competent evidence. *In Re Adoption of J.J.,* 511 Pa. 590, 593–594, 515 A.2d 883, 885–886 (1986); *In Re Adoption of M.A.R.,* 405 Pa.Super. 131, 134–135, 591 A.2d 1133, 1135 (1991). Absent an abuse of discretion, an error of law or insufficient evidentiary support for the chancellor's decision, the decree must stand. *Adoption of M.A.R., supra* at 134–135, 591 A.2d at 1135. Moreover, in a proceeding to terminate involuntarily a parent's rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing evidence" the existence of grounds for doing so. *In Re E.S.M.,* 424 Pa.Super. 296, 622 A.2d 388 (1993).

 Involuntary termination of the rights of a parent is governed by 23 Pa.C.S. § 2511, which, in pertinent part, states:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition is filed on any of the following grounds:

(1) the parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claims to a child or has refused or failed to perform parental duties.

. . . . .

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

The statute does not require a showing of both an intention to relinquish parental control and a failure to perform parental duties. *Baby Boy A. v. Catholic Social Services,* 512 Pa. 517, 521–523, 517 A.2d 1244, 1246 (1986); *In the Matter of the Adoption of David C.,* 479 Pa. 1, 387 A.2d 804 (1978).

It is important to note that the statutory six-month requirement is not mechanically applied, and parents who fail to meet their parental obligations for a six-month period do not automatically forfeit their parental rights. *In Re Adoption of Hamilton,* 379 Pa.Super. 274, 280–281, 549 A.2d 1291, 1294 (1988); *In Re Adoption of Ostrowski,* 324 Pa.Super. 216, 219, 471 A.2d 541, 543 (1984). Rather, the court must examine the individual circumstances of the case and any explanation offered by the parents to determine if that evidence, in light of the totality of the circumstances, clearly warrants involuntary termination of that parent's rights. *Adoption of Hamilton, supra* at 280–281, 549 A.2d at 1294; *Adoption of Ostrowski, supra* at 219, 471 A.2d at 543. In making such a determination the court must consider the barriers to exercising his or her parental rights which the parent faced in deciding whether that parent has abandoned the child. *In Re Baby Boy H.,* 401 Pa.Super. 530, 534–535, 585 A.2d 1054, 1056 (1991). To obtain benefit of this excuse, a parent must exhibit reasonable firmness in attempting to overcome the barriers or obstructive behavior of others; he or she must affirmatively demonstrate love, protection and concern for the child. *Baby Boy A., supra* at 521–523, 517 A.2d at 1246.

Finally, before termination can be ordered, the court must find that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to [the] removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to [the] removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the children. *In Re: B.J.R.,* 397 Pa.Super. 11, 579 A.2d 906 (1990). *See also* 23 Pa.C.S. § 2511(a)(2) and (a)(5).

Instantly, the record reveals that Michael was removed from appellant's care and placed in a foster home on July 22, 1981. As we previously discussed, the chronic homelessness and unemployment of appellant led to Michael's placement in

foster care. Throughout the past 14 years, appellant has demonstrated a continued inability or unwillingness to improve her financial or residential condition. In view of this prolonged failure to remedy the conditions which caused appellant's inability to care for Michael, it is extremely unlikely that she will muster, in the future, the desire or resources to adequately care for Michael.

With regard to the services provided or available to appellant through DHS, our review of the record indicates that appellant was uncooperative and resistant to the agency's attempts to assist appellant. Moreover, appellant has repeatedly failed to visit Michael on a relatively consistent basis or to attend DHS meetings concerning his best interests. Under these circumstances, it is unlikely that further agency programs or services would be effective in remedying the conditions which led to Michael's placement.

As to the fifth requirement of *In Re: B.J.R., supra,* namely, that the termination furthers the best interests of Michael, the record abundantly supports the trial court's decision. Not only has Michael manifested a desire to be adopted by the parents with whom he has resided since 1981, but we find that his foster home is indeed a "stable, safe, caring environment." (Slip Op. at 4.) This stands in sharp contrast to the "nomadic or homeless existence" which appellant steadfastly refuses to abandon. Hence, we find that the best interests of Michael are effectively served by the termination of appellant's parental rights, thus paving the way for his adoption. This conclusion will allow Michael to enjoy the love and stability offered by the only parents he has ever known, in the only home he has ever known. We note that we are not terminating appellant's rights solely because of her financial or residential status. Rather, our decision is based upon appellant's disregard of her parental duties. In sum, our review of the record reveals not a shred of evidence that Michael's "best interests" would be served by preserving appellant's parental rights.

Finally, we note that in support of her arguments on appeal, appellant states, without offering a single supporting circumstance, that she is now "trying to remedy her financial situa-

tion in order to be able to eventually provide for the child" (Appellant's brief at 6), and that she "has always been interested in [Michael's] welfare." (Appellant's brief at 7.)

We have consistently held that "mere renewal of interest and expression of desire for the return of a discarded child do not negate the abandonment...." *Baby Boy A., supra* at 523–524, 517 A.2d at 1247, *quoting In Re In the Matter of J.F.*, 487 Pa. 115, 124–125, 408 A.2d 1382, 1387 (1979). A parent cannot protect parental rights by merely stating that she does not wish to have her parental rights terminated. *In Re E.S.M., supra.* Rather, a parent has an affirmative obligation to *act* in the child's best interest. *Id.* As we stated in *Adoption of Hamilton, supra* at 274, 549 A.2d at 1291:

> To be legally significant, [parent/child] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role.

Instantly, despite her claims to the contrary, the record overwhelmingly demonstrates that appellant has not shown a "willingness and capacity" to assume her parental responsibilities.

Based on the foregoing, we affirm the January 13, 1994 Decree terminating appellant's parental rights.

Decree affirmed.